**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

EVEREAN MITCHELL, on her own behalf
and on behalf of others similarly situated,

                    Plaintiffs,

vs.                                                      Case No. 3:96-cv-447-J-32TEM

FORD MOTOR CREDIT CO.

                    Defendant.

_____

### ORDER

This case concerns the early termination of a consumer automobile lease, and is

brought pursuant to Section 183 of the Consumer Leasing Act ("CLA"). provisions of the

Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1667-1667e, and state law.  Before the Court is

Defendant's Motion For Summary Judgment On Plaintiff's Second Amended Complaint and

supporting memorandum (Docs. 268, 269), plaintiff's response in opposition (Doc. 272), and

defendant's reply.  (Doc. 285.)  Both parties have filed numerous exhibits.

## I.    **Background**[1]

On May 21, 1996, Plaintiff Everean Mitchell entered into a 24-month closed-end lease

---

[1]      Consistent with summary judgment practice, the facts stated are either undisputed
or are stated in a light most favorable to Plaintiff.  See White v. Mercury Marine, Div. of
Brunswick, Inc., 129 F.3d 1428, 1430 (11th Cir. 1997).

Mitchell cites to the facts as recited by the Eleventh Circuit in Higginbotham v.
Ford Motor Credit Co., 270 F. App'x 864 (11th Cir. 2008).  (See Doc. 272 at 3.)

agreement[2] with a Georgia car dealer to lease a 1996 Ford Taurus. The lease was assigned to defendant Ford Motor Credit Co. ("Ford"). (Doc. 259 at 9-10 (2d Am. Compl. ¶¶ 27, 28).) The lease obligated Mitchell to pay 24 monthly payments of $385.91 each, for a total over the life of the lease of $9,261.84. As set forth in the lease, Ford estimated the residual value of the vehicle at the end of the lease-term to be $11,606.40. (Id. ¶ 30; see also Docs. 269-2 at 2 (Affidavit of Pat K. Dudley ("Dudley Aff.) ¶ 3); 270-1 at 8 (Lease).)[3] The lease provided for a voluntary early termination, requiring the lessor to pay:

> (a) an early termination fee of $200, plus (b) the difference, if any, between the Unpaid Net Capitalized Cost and the Vehicle's Fair Market Wholesale Value,[4] plus (c) all other amounts then

---

[2]    ""A *closed-end lease* is a lease in which the lessee is not responsible for the difference if the actual value of the vehicle at the scheduled end of the lease is less than the residual value, but the lessee may be responsible for excess wear and tear and excess mileage charges and for other lease requirements. In contrast, an *open-end lease* is one in which the lessee's liability at the end of the lease term is based on the difference between the residual value and its realized value. The *residual value* of a vehicle is the projected value of the vehicle at the end of the lease that is assigned at the beginning of the lease."" Higginbotham v. Ford Motor Credit Co., 270 F. App'x at 865 n.1 (emphasis added)(quoting Miller v. Nissan Motor Acceptance Corp., 362 F.3d 209, 212 n.2 (3d Cir. 2004)); 12 C.F.R. § 213.2(d) and (i) (in an open-end lease, the lessee owes the difference between the residual and realized values at the end of the lease term; a closed end lease is defined as any lease which is not an open-end lease).

[3]    "Residual value means the value of the leased property at the end of the lease term, as estimated or assigned at consummation by the lessor, used in calculating the base periodic payment." 12 C.F.R. § 213.2(n).

[4]    Mitchell refers to the "Fair Market Wholesale Value" as the "Realized Value." The "Fair Market Wholesale Value" is either an amount agreed to by the lessor and lessee, or "the value which could be realized at the wholesale sale of the Vehicle, as determined by a professional appraisal . . . ." (Lease ¶ 20); see also 12 C.F.R. § 213.2(m)("realized value" is "[t]he price received by the lessor for the leased property at disposition" or "[t]he fair market value of the leased property at the end of the lease term"). "Realized value is relevant only to leases in which the lessee's liability at early termination or at the end of

2

due under this Lease.

(Lease ¶ 20.)  Likewise, a lessor in default of the lease is required to pay "(a) the difference, if any, between the Unpaid Net Capitalized Cost (see Item 20) and the net amount received by Ford at sale, plus (b) all other amounts then due under this Lease" plus expenses. (Lease ¶ 21.)  The "capitalized cost" is the initial cost of the vehicle at the commencement of the lease; it is "the amount agreed upon by the lessor and the lessee as the value of the leased property" and when adjusted for specified items, "is the amount used by the lessor in calculating the base periodic payment.  12 C.F.R. § 213.2(f); (see also 2d Am. Compl. ¶ 8.) The "Unpaid Net Capitalized Cost" is the vehicle's "Capitalized Cost" less depreciation already paid.  (2d Am. Compl. ¶ 18; Lease ¶ 20.)[5]

After making twenty-one of the twenty-four payments (paying $7,718.00), Mitchell

---

the lease term is the difference between the estimated value of the property and its realized value."  12 C.F.R. Pt. 213, Supp. I-C1-1, 2(a)(14)1 (1995)(Official staff commentary to regulation M); see also id. at 4(g)(12)2 and 3.

[5]     The determination of the lessee's monthly lease payments has been described as follows:

> First, the difference between the capitalized cost and the residual value is the "depreciation" of the vehicle during the lease term.  The total depreciation is divided by the number of months in the lease.  Second, the total rent charge, which is the interest on the capitalized cost of the car during the life of the lease, is also divided by the number of months in the lease.  These two monthly figures are added together to form the base monthly payment before any applicable sales taxes.

Gaines v. American Honda Fin. Corp., No. 99-CV-2382 H(AJB), 2000 WL 33676150, at *1 (S.D. Calif. May 30, 2000); see also Miller v. Nissan Motor Acceptance Corp., No. CIV.A 99-4953, 2000 WL 1599244, at *2-3 (E.D. Pa. Oct. 27, 2000), aff'd in part and rev'd in part, 362 F.3d 209 (3d Cir. 2004).

returned the Taurus to the dealer and terminated her lease approximately three months early. (2d Am. Compl. ¶ 31; Dudley Aff. ¶ 11.) Mitchell made the twenty-first and last payment on January 27, 1998. (Dudley Aff. ¶ 11.) On February 4, 1998, Mitchell took the vehicle to a Georgia Ford dealer for repairs "and stated her intention to turn in her vehicle and terminate the lease after the repairs had been made. Ford Credit advised Ms. Mitchell that she was required to make the three remaining payments on the lease to terminate the lease at full term." (Dudley Aff. ¶ 10; see also Doc. 272-3 at 2 (Mitchell Aff. ¶ 2).) Mitchell instead terminated the lease early owing $1,155.00 in unpaid lease payments plus additional amounts for excess mileage charges. (Doc. 156 at 1.)

On March 30, 1998, Mitchell signed a Vehicle Condition Report. According to the Report, Mitchell owed $561.88 in excess mileage charges, tax on the excess mileage charge of 7% amounting to $39.33, and three monthly payments totaling $1,155.00 less $400.00 for her security deposit. The Report indicates that the net amount due Ford was $1,356.21. (Doc. 272-2 at 2.) Notes on the Report indicate that "Cust[omer] refuses to give charges and last paym[ent]." (Id.; Doc. 272 at 5; Mitchell Aff. ¶¶ 3-4.)[6] According to Ford customer service notes, on March 31, April 9, and April 15, 1998, "Ford Credit representatives contacted Ms. Mitchell and advised her to pay the remaining three payments under the lease in order to terminate the lease at full term." (Dudley Aff. ¶ 12.) Ford repossessed and sold the car at auction for $7,800.00 (2d Am. Compl. ¶ 31), establishing the "fair market

---

[6]    Plaintiff attempts to set up a dispute over whether or not Mitchell agreed to pay any amount on March 30 in connection with the Vehicle Condition Report. (Doc. 272 at 6-7.) This alleged "dispute" is not material to the ultimate question presented by this case on summary judgment.

wholesale value." (2d Am. Compl. ¶ 31.) Mitchell has not made any post-termination payment. (Dudley Aff. ¶ 9.)

On October 14, 1998, Ford filed suit against Mitchell in Georgia state court seeking to collect default charges under the lease in the amount of $4,772.61, an amount calculated pursuant to the early termination formula in the lease. (Lease ¶ 20; Doc. 269-3 at 2.)[7] Mitchell counterclaimed against Ford in the Georgia case, alleging that Ford's early termination charge was unreasonable pursuant to the CLA. 15 U.S.C. § 1667b(b). "At the time she was assessed the early termination charge pursuant to Ford's standard formula, Mitchell had paid all but the last [three] monthly payments due under her lease. Accordingly, she had paid a total of $7,718 in monthly payments, plus a $400 security deposit for total payments of $8,118. Ford's early termination formula called for her to pay an additional $4,772 yielding total payments of $12,890 - approximately $3,600 more than the total payments called for under the lease." (2d Am. Compl. ¶ 33.)

Citing what it said was Mitchell's acknowledgment of money owed in the March 31, 1998 Vehicle Condition Report, Ford, on July 30, 1999, Ford amended its Georgia state court complaint to seek $1,356.21, representing the three unpaid monthly lease payments, excess mileage charges and tax minus the security deposit, but did not include the early termination charge. See Higginbotham, 270 F. App'x at 865; (see also Dudley Aff. ¶¶ 8, 13;

_____

[7]     In its reply brief, Ford made several demonstrative applications of its lease early termination formula, including using the residual and actual values applicable to Mitchell's vehicle. According to Ford, the early termination charge under the early termination formula is actually $5,143.90, "which might be attributable to a waiver of the early termination fee and all other amounts due." (Doc. 285 at 5.) Ford characterized the difference as "not materially relevant."

5

Docs. 269 at 5; 269-4 at 5-6 (Interrogatory 7); 269-5 at 2.)

On August 20, 1999, Mitchell, along with two other plaintiffs, joined a fourth plaintiff named Carla C. Higginbotham in filing a first amended complaint in this putative class action, pursuant to the CLA and state law to challenge as "unreasonable" the early termination formula in the standard lease agreement used by Ford, mirroring Mitchell's state court counterclaim.  (Doc. 26.)[8]  Ford counterclaimed here for $1,356.21.  (Doc. 27; see also Higginbotham, 270 F. App'x at 865.)

Ford filed motions for summary judgment as to each plaintiff, including Mitchell. (Docs. 40, 42, 44, 46.)  Ford contended it was entitled to summary judgment against Mitchell arguing she had no standing because Ford was no longer seeking to collect from Mitchell pursuant to the disputed lease termination clause.  (Doc. 43.)  As to the remaining three defendants, including Higginbotham, Ford addressed the substantive merits of the plaintiffs' amended complaint, and argued that its early termination clause did not violate the CLA, common law, or the provisions of the Unified Commercial Code, U.S.C. § 2-718.  (Docs. 41, 45, 47.)

On August 24, 2004, the Court[9] entered summary judgment in favor of Ford and against Mitchell, finding that Mitchell lacked standing because Ford was no longer pursuing

---

[8]     Ford and Mitchell subsequently entered into a tolling agreement that tolled the parties' claims in the Georgia state court action during the pendency of this case. Higginbotham, 270 F. App'x at 865.

[9]     United States District Judge Wayne E. Alley (now retired).

an early termination charge. (Doc. 156).[10] Ford subsequently dismissed its counterclaim.

(Docs. 163, 177), and the Court denied reconsideration of the summary judgment against

Mitchell. (Doc. 187.) On appeal, the Eleventh Circuit reversed. Higginbotham v. Ford Motor

Credit Co., 270 F. App'x 864 (2008). Noting that Ford applied an early termination charge

to Mitchell and pursued that charge by instituting an action in Georgia state court against

Mitchell, the court said

> [i]f it is shown that Ford's early termination charge was, in fact,
> unreasonable under 15 U.S.C. 1667b(b), Mitchell suffered an
> injury in this case. Once Ford applied the early termination
> charge to Mitchell and failed to take the requisite corrective
> actions under § 1640(b),[11] Mitchell incurred an injury for which
> at least statutory damages were recoverable.

Id. at 867. "Ford's subsequent decision to not pursue the early termination charge did not

eviscerate the injury that Mitchell had already incurred." Id. at 868. The Eleventh Circuit

remanded Mitchell's case for further proceedings.

On remand, Mitchell alleges in her second amended complaint that in violation of the

CLA and "established law limiting the assessment of liquidated damages," "Ford, pursuant

to its standard formula, routinely charges lessees upon default or early termination amounts

which are unreasonable in light of the anticipated or actual harm caused by the default or

early termination," specifically by "routinely" charging "more than the total remaining

---

[10]     Also on August 24, 2004, the Court also entered summary judgment in favor of
Ford and against the remaining three plaintiffs on various grounds. (Docs. 154, 155,
157.) None of the other three defendants moved for reconsideration or appealed the
judgments against them.

[11]     15 U.S.C. § 1640(b) provides that no relief is available if the creditor corrects the
error prior to instituting legal action. See Higginbotham, 270 F. App'x at 867.

payments due pursuant to the subject lease." (2d Am. Compl. ¶¶ 2, 3.)

The basis of Mitchell's complaint is that she (and putative class members) executed a "closed-end" lease with Ford, which according to Mitchell means that the "lessees do not bear any risk above and beyond the full payment of the monthly payments pursuant to the contract." (Id ¶¶ 16, 22.) Mitchell alleges that in the event of early termination or default, Ford's early termination formula seeks to recover "the full amount of depreciation (not provided for in the contract) which actually occurs with respect to the lease" which can be "in excess of the total remaining lease payments." (Id. ¶¶ 4, 5, 22.)

> 9.     Whenever Ford sells or liquidates a vehicle upon early termination or default for a value less than the stated Residual Value, the lessee will be charged more - in total - upon early termination or default than the full amount of payments due pursuant to the lease. This occurs because the lease limits the amount of depreciation by contract to the difference between Capitalized Cost and Residual Value. However, defaulting or early terminating lessees are required to pay the difference between Capitalized Cost and *actual* value at lease end. To the extent that this actual value at the time of default or early termination is less than the stated Residual Value, the lessee will be required to pay more in depreciation than the full contractual performance required under the lease and therefore the lessee will be assessed more in total damages than the full amount required to be paid pursuant to the lease.

(Id. ¶ 9; see also id.¶¶ 20, 22.) The Ford closed-end lease "is not designed to capture the full amount of depreciation which will occur during the time period of the lease." (Id. ¶ 10.) Mitchell alleges that Ford's early termination and default formula "systematically provide[s] Ford with a windfall recovery whenever the Residual Value stated in the lease is more than the Realized Value. Ford's formula results  in Ford receiving more from an early terminating lessee or defaulting lessee than it would have received had the same lease continued to the

8

end of its term" (id. ¶ 23), and is an unenforceable "liquidated damages clause . . . because it is a penalty and imposes on lessees including plaintiff and the putative class damages that are not reasonably related to Ford's actual or anticipated damages." (Id. ¶ 24.)

Count I of the second amended complaint alleges Ford violated the CLA, 15 U.S.C. § 1667b(b) as follows:

> Ford's uniform formula and procedure for assessing and imposing charges upon lessees in the event of early termination and default violates § 183 of the CLA, 15 U.S.C. § 1667b(b), in that it results in charges that are not reasonable in light of the anticipated or actual harm caused to Ford by early termination . . . . The formula violates the CLA in that it results in Ford obtaining more than full contractual performance upon early termination or default.

(Id. ¶ 47 (emphasis added).)  Mitchell seeks statutory and actual damages, with costs and fees.

Count II of the second amended complaint, entitled "Unjust Enrichment," alleges that "Ford's early termination formula is a penalty clause that is unenforceable under the common law, under the Uniform Commercial Code governing liquidated damages, and under the Consumer Leasing Act," resulting in an "illegal recovery by Ford whenever the residual value is more than the actual value of the automobile at the time of early termination or default" and the lessee is required to pay more than had the lessee reached full performance.  (Id. ¶¶ 51, 52.)  Mitchell alleged that Ford was "unjustly enriched" and is "liable to disgorge to plaintiff . . . the amount by which it has been unjustly enriched." (Id. ¶¶ 53, 55.)

Count III of the second amended complaint entitled "Declaratory and Injunctive Relief," alleges that Ford's "early termination/default formula is a penalty clause" pursuant

9

to which Ford has assessed damages from plaintiffs and members of the putative class. (Id. ¶¶ 57, 58.)  Mitchell seeks a declaration that she is not obligated to pay Ford the early termination/default damages it has assessed and an injunction preventing Ford from collecting such damages and requiring Ford to correct any collection or credit reports.  (Id. ¶ 61.)

Mitchell in her second amended complaint, challenges Ford's early termination formula "as applied."  As stated by Mitchell, the second amended complaint "alleges only that Ford's early termination/default formula violates the Consumer Leasing Act ("CLA") provisions of the Truth and [sic] Lending Act ("TILA"), 15 U.S.C. § 1667b(b) when its application results in assessing against early terminating/defaulting lessees *more than Ford would have received if the lessees fully performed their leases.*"  (Doc. 272 at 1-2 (emphasis in original).)  "Mitchell does not ask for a finding that the formula itself is invalid but only that it is unreasonable when it results in lessees being required to pay more than full performance."  (Doc. 272 at 13.)

## II.  **Summary Judgment Standard**

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine, material factual dispute."  Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted).  An issue is genuine when the evidence is such that a reasonable jury

could return a verdict for the nonmovant. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986). In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor. <u>Centurion Air Cargo, Inc. v. United Parcel Serv. Co.</u>, 420 F.3d 1146, 1149 (11th Cir. 2005).

**III.  Discussion**

**A.  Count I: Consumer Leasing Act, 15 U.S.C. § 1667b(b)**

The CLA is part of a larger statutory scheme known as the Truth in Lending Act ("TILA"). 15 U.S.C. §§ 1601 et seq. As a consumer protection statute which is remedial in nature, the CLA must be liberally construed in favor of the consumer. <u>Carmichael v. Nissan Motor Acceptance Corp.</u>, 291 F.3d 1278, 1280 (11th Cir. 2002). The CLA requires that a lease contain "[a] statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the term and the amount or method of determining any penalty or other charge for delinquency, default, late payments, or early termination." 15 U.S.C. § 1667a(12). Section 1667b(b) of the CLA states:

> Penalties or other charges for delinquency, default, or early termination may be specified in the lease but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the delinquency, default or early termination, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

15 U.S.C. § 1667b(b). The legislative history of the CLA states that § 1667b(b) "is intended to protect consumers from unwarranted penalties or forfeitures for delinquency or default, or whenever the lease is terminated prior to its scheduled expiration." S. Rep. No. 94-590,

11

at 7 (Jan. 21, 1976), as reprinted in 1976 U.S.C.C.A.N. 431 at 437. A plaintiff suing pursuant to section 1667b(b) may seek relief under TILA's damages provision for actual and statutory damages. 15 U.S.C. § 1640.

The Eleventh Circuit considered section 1667b(b) in the case Baez v. Banc One Leasing Corp., 348 F.3d 972 (11th Cir. 2003). There, the Eleventh Circuit affirmed the district court's conclusion, in granting summary judgment in favor of the creditor, that "the early termination provision was 'reasonable in light of the anticipated or actual harm caused by the delinquency, default or early termination . . .' as required by § 1667b(b)." 348 F.3d at 973-74. Similar to the early termination provision found in Mitchell's lease to the extent that it permitted an early termination charge based on the difference in residual and realized value, the court observed "[i]f Torres had kept the car for the full lease term, he would have paid an amount equal to Banc One's [the creditor's] estimation of the car's depreciation during the lease term, plus interest. Under the early termination provision, however, Banc One charged Torres and similarly-situated lessees the amount his lease actually depreciated during the time he held the car, plus interest." Id. at 974 n.2. The Court agreed "with the district court's conclusion and its reasoning in support of that conclusion." Id. at 974.

Details of the transaction considered by the Eleventh Circuit in Baez are set forth in the district court's opinion. Torres v. Banc One Leasing Corp., 226 F. Supp.2d 1345 (N.D. Ga. 2002), aff'd in part, vacated in part on other grounds, 348 F.3d 972 (11th Cir. 2003).[12]

---

[12]    The Eleventh Circuit vacated an unrelated portion of the district court's order for failing to address a co-defendant's pending motion to amend his complaint. 348 F.3d at 974.

In <u>Torres</u>, the lessor Torres entered into a 60-month closed-end automobile lease. 226 F. Supp.2d at 1346. The lease's early termination formula required the lessor to pay the sum of

> (1) all payments which were due or overdue at the time of termination, plus (2) the sum of the remaining monthly payments, plus (3) the residual value of the vehicle, minus (4) unearned rent charges included in the remaining monthly payments . . . minus (5) the realized value of the vehicle.

<u>Id.</u> at 1347. Torres terminated the lease 39 months early, and defendant Banc One billed the lessee pursuant to the early termination formula.[13] The district court first considered plaintiff Torres' argument that the early termination formula violated the CLA "because it makes an early terminating lessee responsible for covering any shortfall in the vehicle's actual realized value as against the projected end of lease residual value." <u>Id.</u> at 1348. The court concluded that under section 1667b(b) and its implementing regulation, 12 C.F.R. § 213 ("Regulation M"),[14] "such charges are proper under the Leasing Act so long as proper notice is given." <u>Id.</u> at 1349.

Second, the court concluded that such early termination charge may be applied in a so-called closed-end lease, in which the risk that the realized value of the vehicle might not meet the projected residual value at the end of the term "if the lease goes to full term" is on

---

[13] Banc One sent Torres an invoice for $6,365.97, representing depreciation payments totaling $9,253.53, plus residual value of $4,537.50, plus fees of $74.94, minus sale proceeds of $7,500.00  226 F. Supp.2d at 1347.

[14] Regulation M is promulgated by the Board of Governors of the Federal Reserve System, <u>see</u> 15 U.S.C. § 1604, to implement the consumer leasing provisions of the Truth in Lending Act. 12 C.F.R. § 213.1.

the lessor. Id. at 1349 (citing 12 C.F.R. § 213.2(d)). "Understanding that 'early termination' and the 'end of the lease term' are different events, . . . Regulation M shows a closed-end lease may assess early termination charges based on the difference in the residual and realized value of leased property." Id. at 1349-50 (citing 12 C.F.R. §§ 213.2(d) and (i), 213.4(k) and (l)). The court stressed that while the charge based on the difference between residual and realized values can be charged at the end of the lease only in an open-end lease, the charge can be used for early termination of either type of lease. Compare 12 C.F.R. § 213.2(d) and (i) and § 213.4(k) and (l).

Third, the district court held that the charges produced by the early termination formula "are reasonable in light of the harm caused by early termination." Torres, 226 F. Supp.2d at 1350. Considering the "realities of automobile lease financing," in which most depreciation of a vehicle occurs "at the beginning of a lease" while the lessee's depreciation payments are linear and equally distributed throughout the life of the lease, the court reasoned:

> When Plaintiff terminated his lease early, [lessor] was deprived of the chance to make up the full amount of depreciation on the vehicle because the depreciation at the beginning of the lease was greater than the amount of depreciation payments Plaintiff made on the lease. The early termination charge in [lessor's] lease is designed to recapture the depreciation lost at the beginning of the lease via lower depreciation payments. It does this by adding the rest of the equal depreciation payments to the residual value and then subtracting what the lessor actually received, the value of the early returned vehicle. Such a formula makes Plaintiff responsible for the difference in the realized and residual value of the vehicle. It also makes Plaintiff responsible for the depreciation he consumed without payment during the first 21 months of the lease.

14

226 F. Supp.2d at 1350.

The court distinguished the facts of the <u>Baez/Torres</u> lease where the estimated residual value of the vehicle at the end of the lease was less than the actual re-sale value of the early-terminated leased vehicle from the "hypothetical injury" to the consumer when the residual value is higher than the actual realized value (as is the situation here),[15] observing in dicta that in such a case, "an 'inflated' residual value has no adverse effect on the early termination charge since an inflated residual value would be offset by lower depreciation payments under the Defendant's formula." 226 F. Supp.2d at 1351.

This Court applied the <u>Baez</u> decision to plaintiff Higginbotham in this case, entering summary judgment in favor of Ford. (Doc. 157 (<u>Higginbotham v. Ford Motor Credit Corp.</u>, No. 96-CV-447-WEA-HTS, 2004 WL 2203523 (M.D. Fla. Aug. 24, 2004).) Plaintiff Higginbotham, who had a 36-month closed-end lease with Ford, terminated the lease after 15 months, owing more than 24 months in payments. Ford sought to recover the amount owed pursuant to the early termination formula. Higginbotham's "monthly payments totaled $469.99, and had she not terminated early she would have paid $11,279.26 to Ford during the remainder of the lease. The lease-stated residual value of her vehicle was $9738.00 and the car was sold for $11,000.00 following her early termination. Ford originally sought $6,831.87 from Higginbotham pursuant to the early termination formula provision in the lease, although it ceased its efforts after this action was filed." (Doc. 157 at 4.)

---

[15] The <u>Torres</u> court specifically distinguished the case <u>Miller v. Nissan Motor Acceptance Corp.</u>, No. CIV.A 99-4953, 2000 WL 1599244 (E.D. Pa. Oct. 27, 2000), <u>aff'd in part and rev'd in part</u>, 362 F.3d 209 (3d Cir. 2004), cited by plaintiff. <u>See</u> <u>infra</u> at 18.

Higginbotham did not pay the charge, and brought suit against Ford alleging, along with Mitchell and other co-plaintiffs that "the lease entered into with Ford improperly shifted the burden that the residual value of the vehicle was inflated to the lessee and that the residual value was not the best available estimate of the car's value at the end of the lease term." (Id. at 1.) Concluding that Higginbotham's termination clause "is essentially identical" to the clause considered by the Court in Baez/Torres, the Court held that "Ford's early termination provision in the Higginbotham lease was reasonable as well." (Id. at 4.) "As in Torres, given that Ms. Higginbotham terminated her lease so early, the realized value on her vehicle exceeded the residual value by more than one thousand dollars," and the argument that the early termination formula is unreasonable is without merit. (Id.) Higginbotham, represented by the same counsel as Mitchell, did not appeal the ruling.

Ford argues that the early termination formula in Mitchell's lease is "materially identical" to 1) the early termination formula in Higginbotham's lease, and 2) the early termination formula examined and upheld in Torres, supra and Baez, supra. In accordance with the terms of its early termination formula, Ford contends that the early termination charge in the Mitchell lease "is comprised of amounts due under the Lease *plus* the Unpaid Net Capitalized Costs *minus* the amount received upon Ford's sale of the vehicle (the vehicle's 'realized value')." (Doc. 269 at 9.) Ford contends that the termination charge is reasonable because it reflects "actual" damages, and that the early termination provision "was reasonable in light of the difficulties of estimating, at least at inception, the difficulties of proof of loss, and the inconvenience and nonfeasibility of otherwise obtaining an adequate remedy." (Doc. 269 at 12 (citing Baez).) "Torres/Baez endorses such risk shifting, as long

16

as the lessor recoups *actual* depreciation, as Ford Credit sought to do based on the realized value." (Doc. 269 at 17 (emphasis in original).)

Mitchell says that the fact that she challenges the Ford early termination formula when its application results in assessing more than Ford would have received if the lessee had fully performed the lease distinguishes her claim factually from the claims decided in <u>Baez</u>, <u>Torres</u>, and <u>Higginbotham</u> "where the leases were terminated well before the end of the term and application of early termination formulas similar to Ford's did *not* result in assessing charges for more than the lessor would have received had the lessees fully performed their leases." (Doc. 272 at 2 (emphasis in original).) Further, Mitchell argues that Ford has not offered any "economic justification or otherwise explained how its early termination formula can be enforceable when it requires early-terminating lessees like Mitchell to pay more than is due for full performance." By entering into a "closed end" lease, "Ford cannot have an expectancy of receiving *more* than the amount of depreciation charged pursuant to the lease." (Doc. 272 at 9 (emphasis in original).) Mitchell argues that while <u>Baez/Torres</u> approved an early termination provision in a closed-end lease which based early termination charges upon the difference in realized and residual values, the holding is not applicable to her claim where Mitchell terminated a lease on the eve of the end of the lease term and the estimated residual value of the vehicle was much larger than the actual realized value, resulting in an early termination assessment approximately $3,600 in excess of what she owed had the lease gone to full term. By contrast, in <u>Baez/Torres</u>, "[t]he lease here was terminated so far in advance of the termination date that the value of the vehicle was much greater by thousands of dollars than it was projected to be at the end of the lease". <u>Torres</u>,

226 F. Supp.2d at 1351.[16]  In support of her position, Mitchell cites Johnson v. Steven Sims Subaru, Inc., No. 92-CV-6355, 1993 WL 13074115 (N.D. Ill. Aug. 20, 1993)(finding that lessee successfully stated a claim for unreasonable termination charges, where an inflated residual value resulted in a lessee who terminated early to pay more money than a lessee who made all the  payments for the full five-year term of the lease)[17] and Miller, 2000 WL 1599244[18] (district court determined that charges assessed under the lease formula for early termination, which were greater than what the lessee would have paid had he retained the vehicle to the end of the lease, were not reasonable).[19]

This Court is bound, of course by the Eleventh Circuit's decision in Baez, supra.

---

[16]    The Eleventh Circuit's decision on Mitchell's standing did not reach any legal conclusions about the merits of Mitchell's claim under the CLA, or that Mitchell's claim is not precluded by the Baez decision, as Mitchell suggests.  (Doc. 272 at 9-10.)  Rather, the Eleventh Circuit stated that "[i]f it is shown that Ford's early termination charge was, in fact, unreasonable under 15 U.S.C. § 1667b(b), Mitchell suffered an injury in this case." Higginbotham, 270 F. App'x at 867.

[17]    The Magistrate Judge's Report and Recommendation in Johnson was never adopted by the district court because the case was settled before the district court ruled on objections that were filed.  Miller, 362 F.3d at 223.

[18]    The Third Circuit vacated summary judgment for lessees in Miller on the reasonableness of the early termination formula because it determined that the lessees did not have standing to make the challenge as the formula had never been applied to them.  Miller, 362 F.3d at 221-25, 227.

[19]    Mitchell also cites the Uniform Commercial Leases Act, 2001 (Docs. 272 at 15; 272-12 to 272-16 (Exs. 6, 7)) which proposes that "[a] charge imposed on a lessee for early termination of a consumer lease other than an open-ended consumer lease may not exceed the total of the remaining periodic payments scheduled under the lease." Uniform Consumer Leases Act § 405(b).  (Doc. 272-16 at 2.)  The model act has not been adopted by Congress or by Georgia.  While interesting, the Court does not consider it in this decision.

Examining a closed-end lease, the court in Baez approved an early termination charge representing "the amount his leased car actually depreciated during the time he held the car, plus interest." Baez, 348 F.3d at 974 n.2. Thus, Mitchell cannot argue that an early termination formula based in part on the difference between the realized and residual values is *per se* unreasonable. However, Baez/Torres does not preclude the additional inquiry into whether or not the resultant termination charge in a given case is reasonable. Indeed, the Baez/Torres court conducted a reasonableness analysis, concluding that the early termination charge there was reasonable as "an attempt to compensate the lessor for the difference between straight line and actual depreciation of the vehicle and for the uneven amortization of principal," where the lease was terminated prior to the half-way point in the lease, the estimated residual value of the vehicle was considerably *lower* than the actual value of the early-terminated vehicle ($4,537.50 residual value and $7,500.00 actual value), and the amount owed by the lessee upon early termination did not exceed the cost of full performance. Torres, 226 F. Supp.2d at 1347.

Ford attempts to apply Baez/Torres' reasonableness analysis here, arguing that its early termination formula ("depreciation recoupment mechanism") "recaptures" depreciation not collected during the early months of the lease because depreciation was spread over the life of the lease equally in the monthly payments. (Doc. 285 at 3 (citing Torres, 226 F. Supp.2d at 1345)). But Mitchell had paid 21 of 24 monthly payments, and presumably most of the depreciation based upon the estimated high residual value of the vehicle, had been paid by the time of Mitchell's termination.

Granted, "'[a] higher residual value results in less scheduled depreciation over the

19

term of the lease, and hence lower monthly payments.'" <u>Miller</u>, 362 F.3d at 213 n.4 (citation omitted); <u>see also</u> <u>Torres</u>, 226 F. Supp.2d at 1351 ("an inflated residual value would be offset by lower depreciation payments under the Defendant's formula"); <u>Johnson</u>, 1993 WL 13074115, at *4 (in a closed-end lease with an inflated estimated residual value, the lessee who completes the lease term "benefits from the lower monthly payments as a result of the higher end valuation"). Ford seizes upon this, contending its early termination formula "counterbalances a higher residual value with lower monthly lease payments, but a potentially higher early termination charge. . . . [T]he higher termination charge. . . is *fully* offset by the benefit that [the lessor] received from an overestimated residual value - lower monthly depreciation charges during the first twenty-one months of her lease." (Doc. 285 at 5 (emphasis in original).) But, Ford's decision to accept lower monthly depreciation payments if the lease ripens to full term does not dictate that Ford may collect "actual" depreciation upon early termination when the result is that Mitchell is required to pay thousands of dollars more than she would have if she had just made the final three payments under the lease.

Section 1667b(b) permits "penalties or other charges" for early termination in

> an amount which is reasonable in the light of the anticipated or actual harm caused by the . . . early termination, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

15 U.S.C. § 1667b(b). Ford focuses on the term "actual harm," stating that its early termination formula as applied to Mitchell merely recoups the actual depreciation of the vehicle and nothing more. But Ford's argument ignores the statutory requirement that the

charge must be "reasonable in the *light* of the anticipated or actual harm" and that the harm must be "*caused*" by the "early termination, the difficulties of proof of loss, *and* the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy." Id. (emphasis added). Ford has adduced no evidence as to any of these three requirements to demonstrate the reasonableness of the early termination charge exacted here.

Congress, in drafting section 1667b(b), chose to include a "reasonableness" standard in its provision governing "[p]enalties and charges" for early termination. This requires the Court to examine the reasonableness of the actual "penalty and charge" exacted under Ford's lease with Mitchell, where Mitchell terminated the lease just before the end of the lease term, and the resultant "penalty and charge" was $3,416.04 greater than Mitchell would have paid had she made the last three lease payments. Under Ford's reasoning, the lessee who terminated the lease with just one remaining payment could be charged even more, inasmuch as the "actual" or "realized" value of the vehicle could be even less, and the disparity between the "residual" value and the "realized" value greater. Application of Ford's early termination clause is not a reasonable approximation of the anticipated or actual harm caused by Mitchell's termination three months before the conclusion of the lease.[20]

The Eleventh Circuit's decision in Baez does not require that an early termination formula in a closed-end vehicle lease that charges the lessee for "actual depreciation" be deemed per se reasonable under the CLA, 15 U.S.C. § 1667b(b). Similarly, this decision is not to be construed as holding that any early termination formula that results in a lessor

---

[20]    Ford apparently recognized this as of at least 2000 when it changed its early termination formula to eliminate this disparity.  See Infra at 25-26.

obtaining more than it would have had the lease gone to full term is per se unreasonable under the CLA.[21]   The touchstone of a reasonableness determination is whether the "[p]enalities or other charges" for early termination, delinquency or default represent "an amount which is reasonable in the light of the anticipated or actual harm caused by the early termination, delinquency or default." 15 U.S.C. § 1667b(b).  The Court's determination here is limited to these precise facts; without any real demonstration by Ford that the penalty is tied to "actual harm caused by the early termination," an early termination assessment of $4,772.16 on a lease due to expire in three months - a sum which was $3,416.04 greater than the amount owed had the lease gone to term - is unreasonable under the CLA.

## B.    Count II: Unjust Enrichment

Mitchell appears to compress two claims into Count II of her Second Amended Complaint: 1) that "Ford's early termination formula is a penalty clause that is unenforceable under the common law, under the Uniform Commercial Code governing liquidated damages and under the Consumer Leasing Act" (2d Am. Compl. ¶¶ 51, 52); and 2) that "Ford has been unjustly enriched at the expense of Mitchell. . . by its collection of the unenforceable early termination default damages."  (Id. ¶ 53.)  The only remedy requested by Mitchell in Count II is that "Ford is liable to disgorge to plaintiff and the class the amount by which it has been unjustly enriched."  (Id. ¶ 55; see also Doc. 259 at 16-17 (2d Am. Compl. Prayer for Relief).)

However, Ford never collected early termination charges from Mitchell pursuant to the

---

[21]    Just an example, there might be storage or other handling costs connected with the early termination that could be properly included in an early termination formula.

early termination formula.  Rather, it amended its Georgia complaint to seek a lesser amount of damages: $1,356.21, representing the three unpaid lease payments, excess mileage charges and tax.  Higginbotham, 270 F. App'x at 865 n.2; (see Dudley Aff. ¶ 9.)  Similarly, Ford's counterclaim in this action seeks recovery of $1,356.21 for "excess mileage charges, overdue payments and taxes [and] net of her security deposit . . . ."  (Doc. 261 at 22-23 (Counterclaim ¶ 4).)  Indeed, Mitchell never paid Ford any amount in connection with the early termination.  The Eleventh Circuit apparently recognized this, finding that Mitchell had standing to pursue her claim for damages under the CLA, "even if the district court ultimately concludes that Ford's decision to not pursue an early termination charge renders her claims for equitable relief moot."  270 F. App'x at 868.[22]

"'[U]nder Georgia law, an unjust enrichment claim requires the plaintiff to establish the following: (1) that the plaintiff conferred a benefit on the defendant and (2) that equity requires the defendant to compensate the plaintiff for this benefit.'"  J'Carpc, LLC v. Wilkins, 545 F. Supp.2d 1330, 1340 (N.D.Ga. 2009)(citation omitted).

> An action for money had and received is a legal action, founded upon the equitable principle that no one ought to unjustly enrich himself at the expense of another, and it is a substitute for an equity action.  It is appropriate where the plaintiff overpays or deposits more than was necessary with another, who has no legal right to retain the money. . . . Plaintiff can recover for money had and received only where it appears that the defendants have received money belonging to the plaintiff which, in equity and good conscience, the defendants are not entitled to retain.

---

[22]    Similarly, in considering Higginbotham's claim, Judge Alley noted that inasmuch as Higginbotham did not pay Ford the amount sought under the early termination provision, "Ford has not been unjustly enriched."  Higginbotham, 2004 WL 2203523, at * 4.

*Cochran v. Ogletree*, 536 S.E.2d 194, 197 (Ga. App. 2000); accord *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009). Given that Mitchell never paid Ford anything pursuant to the early termination formula; her claim of "unjust enrichment" for return of "the amount by which it has been unjustly enriched through use of its unenforceable early termination/default formula" fails as a matter of law.[23]

## C.    Count III: Declaratory and Injunctive Relief

Alleging that Ford's "early termination/default formula is a penalty clause that is unenforceable under common law, under the Uniform Commercial Code and under the Consumer Leasing Act" (2d Am. Compl. ¶ 57), Mitchell seeks a declaration of her rights as well as those of the putative class, declaring they are not obligated to pay early termination

---

[23]    Mitchell states in her response to Ford's motion for summary judgment that "because Mitchell has properly pled a CLA claim, she has also pled a claim pursuant to Section 2-718(a) of the UCC and Section 2A-504 of the UCC." (Doc. 272 at 20.) Mitchell's conclusory assertion does not overcome her pleading deficiency.

Additionally, Mitchell asserts that because "[t]his is a class action . . . , the plaintiff for the class need not have standing to assert each and every claim which class members may assert, but only need to share a common claim or similar underlying facts." (Doc. 272 at 20.) This case has not reached the class certification stage so the designation of any class representative is premature. It is at that point that the Court "must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). "It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert. Rather, 'each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.'" *Id.* at 1280 (quoting *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987)). Inasmuch as Mitchell has not established that Ford was unjustly enriched by money had or received from her, she cannot defeat Ford's motion for summary judgment as to Count II because some unnamed plaintiff may have suffered an injury based upon alleged unjust enrichment.

or default damages assessed against them, and an injunction preventing Ford from collecting such damages and requiring Ford to correct reports it has filed with collection and credit reporting agencies. (Id. ¶ 61.) Significantly, Mitchell has not alleged that she is obligated to pay damages pursuant to the early termination provision, or that Ford has reported the debt to any collection or credit agencies.

The record reflects that Mitchell sought judicial notice in December 2002 of Ford's "revised consumer vehicle lease," (revised in November 2000) "to reduce early termination charges in precisely the manner which Plaintiffs allege they should." (Doc. 130 at 1, 3.) The new standard lease form states that "[p]revious editions may NOT be used." (Id. at 3.) Now, Mitchell argues that declaratory and injunctive relief is appropriate because "Ford has submitted no evidence showing that it no longer charges (under any circumstance) more than full performance or that it will not do so in the future." (Doc. 272 at 7.)[24]

The early termination provisions in Mitchell's lease are apparently no longer in use.

---

[24] Mitchell cites to a 2006 Ford lease form which contains an early termination formula like that in the Mitchell lease. Mitchell omits citation to the lease form's provision that states:

> *Alternatively*, You may chose to satisfy Your [early termination] financial obligation under this section upon Vehicle return if You pay the following: (a) the unpaid remaining Monthly Payments, plus (b) any charges for excess wear and use and mileage, plus (c) all other amounts then due under the lease."

(Doc. 272-5 at 1.) Thus, the early terminating lessee may opt-out of the early termination formula by paying all of the amounts due as if the lease went to full term.

Neither the 2000 nor the 2006 leases cited in this record contain a termination formula which would result in the early-terminating lessee being required to pay an amount greater than full performance of the lease. Mitchell has adduced no evidence of any continuing practice by Ford. Plaintiff is not entitled to injunctive relief based on hypothetical or speculative future harm. Cheoun v. Infinite Energy, Inc., No. 09-13902, 2010 WL 299266, at *4 (11th Cir. Jan. 27, 2010); see also Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1302-03 (11th Cir. 2007)("'[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate - as opposed to a merely conjectural or hypothetical - threat of future injury.'" (citation omitted)).

For the foregoing reasons, and upon due consideration, it is hereby

**ORDERED**:

1.      Defendant's Motion For Summary Judgment On Plaintiff's Second Amended Complaint (Doc. 268) is **DENIED** as to Count I of the Second Amended Complaint and **GRANTED** as to Counts II and III of the Second Amended Complaint. The Clerk shall withhold entry of judgment on Counts II and III until the conclusion of the case.

2.      The parties shall file a joint statement by **April 19, 2010**, setting forth the remaining issues to be resolved and a proposed case management schedule. If the parties are unable to agree, plaintiff shall file her unilateral statement by **April 19, 2010**, and defendant shall file a response by **April 30, 2010**.

**DONE AND ORDERED** at Jacksonville, Florida, this 29th day of March, 2010.

TIMOTHY J. CORRIGAN
United States District Judge

jl.
Copies to:
Counsel of Record